# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL ZENQUIS,

           Plaintiff,

    v.

CITY OF PHILADELPHIA, et al.,

           Defendants.

Civil Action

No.  11-1941

March 16, 2012

## <u>OPINION</u>

Now pending before the court in this matter are the motion to dismiss the claims against the City of Philadelphia ("the City"), filed by the City on April 11, 2011 (Docket No. 7), and the City's motion for leave to file a reply brief to the plaintiff's response to the motion to dismiss, filed on May 18, 2011 (Docket No. 10).  For the reasons that follow, I will grant the motion for leave to file a reply brief *nunc pro tunc*, but I will deny the motion to dismiss.

## I. Background

### A.    Factual Allegations

The following narrative is drawn from the plaintiff's amended complaint, filed on July 20, 2011 (Docket No. 15).  The well-pleaded factual allegations of the amended

complaint must be assumed to be true in evaluating a motion to dismiss for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6).

On the morning of June 1, 2009, an eleven-year-old girl was brutally raped in the Kensington neighborhood of Philadelphia.  Philadelphia police officers received an unsubstantiated tip that an individual known as "Romeo" may have been involved in the rape.  Michael Zenquis was known in Kensington by the nickname "Romeo."  Upon receiving the tip, the defendant police officers began to advise citizens in the Kensington area that Zenquis had committed the rape.[1]  In fact, Zenquis was innocent and entirely unconnected to the crime.

The public identification of Zenquis as a suspect in the rape occurred over the course of several hours on June 1, the day of the crime.  The officer defendants distributed a photograph of Zenquis to citizens in the area and advised the citizens that they should detain Zenquis, and they specifically advised citizens to use physical force.

---

[1]Zenquis alleges that the following individual officers (members of either the Philadelphia Police Department's Special Victims Unit or police districts in the geographical area of the rape) were involved in the investigation of the rape and in the erroneous public dissemination of Zenquis's name as a suspect: Detective Blowes; Officer Joseph Conard; Officer Kathleen Denofa; Detective Francis Dragon; Detective Enriquez; Detective Kevin Gage; Officer Jose Latorre; Officer Lee; Detective Peter Marcellino; Lieutenant Thomas McDevitt; Detective James Miles; Officer Miller; Detective Daniel O'Malley; Officer Raymond Singleton; Officer Tina Walsh; Officer Brian Williams; and Officer Miquon Wilson.  Am. Compl. ¶¶ 8, 14, 18-19.  Zenquis has also named additional "Officer John Doe(s)" defendants.  Am. Compl. ¶ 8.  The individual police officers named in the amended complaint will be referred to, collectively, as "the officer defendants."

The citizens to whom the officer defendants spoke understood that "the clear message from the officers [was] that they would be free to assault [Zenquis] with impunity."  Am. Compl. ¶ 24.[2]

On the afternoon of June 1, Zenquis was assaulted by several individuals in Kensington.  The altercation began when Zenquis was walking in the area of Argyle and Ontario Streets and was called over to Argyle Street by a man whom he knew from the neighborhood.  On Argyle, Zenquis was approached by two other men whom he also knew from the neighborhood.  One of the newcomers struck Zenquis in the eye with a piece of lumber.  The three men then threw Zenquis to the ground and assaulted him.  Several other individuals joined the violence, using improvised weapons (including pieces of lumber and a baseball bat), punches, and kicks.  As he was being beaten, Zenquis heard a woman yelling that he was a "rapist."  Zenquis yelled that he was innocent and had done nothing wrong.  "The civilians who assaulted [Zenquis] had

---

[2]The amended complaint does not specifty which of the officer defendants were in fact involved in distributing Zenquis's photograph or in advising citizens to detain him and/or to use physical force.  Instead, the pleading alleges that all the officer defendants committed these acts and, alternatively, that "[t]o the extent any of the individual defendants did not personally distribute a photograph to civilians, advise civilians to detain plaintiff and/or advise civilians to use physical force against plaintiff, those defendants acted in concert and conspiracy with all other defendants to do so and/or failed to intervene to prevent their fellow officers from carrying out these actions."  Am. Compl. ¶ 23; *see also* Am. Compl. ¶ 19 ("To the extent any of the individual defendants did not personally inform civilians in the Kensington area that plaintiff had in fact committed the rape, those defendants acted in concert and conspiracy with all other defendants to inform civilians that plaintiff had in fact committed the rape and/or failed to intervene to prevent their fellow officers from providing such information to civilians.").

spoken to at least one or more of the individual defendants, and were told . . . that they should detain [Zenquis] and that they would be permitted to use force against [Zenquis]." Am. Compl. ¶ 32.

The assault ended when some of the officer defendants, including Officer Raymond Singleton, arrived at the scene.  Zenquis was arrested.  At the time, the police did not investigate the assault on Zenquis and did not arrest or question any of the other persons at the scene.  Zenquis was then transported to a hospital "for treatment of the multiple physical injuries he sustained during the assault, including serious bruising to his face, back, and foot, and lacerations to his ankle and elbow."  Am. Compl. ¶ 35.[3]

After Zenquis was released from the hospital, he was taken to the Special Victims Unit of the Philadelphia Police Department and interviewed by one or more of the officer defendants, including Detective Peter Marcellino.  Zenquis told the police that he was innocent, and he volunteered to provide a DNA sample.  After DNA testing, the police determined that Zenquis was innocent.  He was released from custody.

On the following day, June 2, 2009, Zenquis gave a statement to the police

_____

[3]The amended complaint does not allege expressly that any of the officer defendants personally observed any part of the assault on Zenquis.  But the severity of Zenquis's injuries and the need for immediate medical care give rise to a reasonable inference that some of the officer defendants were aware at the time of his arrest that Zenquis had been assaulted by persons present at the scene.  Additionally, the amended complaint alleges on information and belief that the officer who eventually took a statement from Zenquis concerning the assault, Detective James Miles, "had been aware of the circumstances of the assault of plaintiff shortly after the time of the assault."  Am. Compl. ¶ 39.

4

concerning the individuals who had assaulted him.  The police had not initiated any

investigation of the assault until contacted again by Zenquis.  Zenquis was able to identify

the two individuals who had begun the attack on Argyle Street.  Police sought arrest

warrants for these two individuals on June 8, 2009.[4]  Ultimately, the charges against one

individual were dropped, but the other individual pleaded guilty.

In the interim, the police continued to investigate the June 1 rape, which Zenquis

had been mistakenly identified as committing.  On June 2, 2009, the police came to

suspect an individual named Jose Carrasquillo.  The police, including at least one of the

officer defendants, advised citizens in Kensington that Carrasquillo had committed the

rape.  As they had done with Zenquis, the police "made clear to the civilians that they

would be permitted to use physical force against Carrasquillo."  Am. Compl. ¶ 44.

On the afternoon of June 2, Carrasquillo was detained on the streets of Kensington

by citizens who had been informed by the police that Carrasquillo committed the rape.

Carrasquillo was chased down and then assaulted by a group of individuals using

"improvised weapons, such as a piece of lumber.  The assault, which was captured on a

video surveillance camera, caused Carrasquillo serious injuries."  Am. Compl. ¶ 45.

When police officers arrived on the scene, Carrasquillo was arrested.  He was later

charged with committing the June 1 rape.  He pleaded guilty to the crime and is currently

---

[4]The amended complaint gives the date of the arrest warrant as June 8, 2010, but
the plaintiff has clarified that the year is a typographical error and should be 2009.

serving a sentence of thirty to sixty years in prison.

In the wake of the public capture of Carrasquillo, Philadelphia Mayor Michael A. Nutter stated that the citizens' actions were "a further demonstration that Philadelphians care passionately about the city, about our quality of life, and certainly about our children." Am. Compl. ¶ 49. Philadelphia Police Commissioner Charles Ramsey stated, after the fact, that "members of the community were very upset over this [rape], and some may have used more force than a trained police officer." Am. Compl. ¶ 50. Ramsey also publicly announced that no criminal charges would be brought against the individuals involved in capturing Carrasquillo. Two of the individuals later received an $11,000 award at a public ceremony.

**B.    Prior Proceedings**

On March 1, 2011, Zenquis initiated the present action pursuant to 42 U.S.C. § 1983 against the City and various "John Doe" police officer defendants (Docket No. 1). The City moved to dismiss the complaint on April 11, 2011 (Docket No. 7). Zenquis opposed that motion on April 29, 2011 (Docket No. 9).

On May 18, 2011, the City filed a motion for leave to file a reply brief to the plaintiff's opposition to the motion to dismiss (Docket No. 10). The City attached its proposed "Reply Memorandum" to the motion. The motion for leave to file a reply remains formally pending. On May 31, 2011, Zenquis filed a memorandum in response to the City's motion for leave to file a reply (Docket No. 11). For docketing purposes, I

will grant the City's motion for leave to file a reply *nunc pro tunc* to May 18, 2011, and I will deem the attached proposed reply memorandum filed as of that date. I have fully considered all of the arguments raised in both parties' filings.

On July 13, 2011, Zenquis submitted an unopposed motion to file an amended complaint (Docket No. 13). The motion was granted on July 20, 2011 (Docket No. 14). The amended complaint substituted the names of the officer defendants for the "John Does" named in the initial complaint, but the pleading did not alter the allegations against the City. To prevent duplicative motion practice, I noted in my order granting the motion to file an amended complaint that I would consider the City's April 11, 2011, motion to dismiss (and, by implication, the responses and replies thereto) as though it were addressed to the amended complaint. The officer defendants have filed an answer to the amended complaint (Docket No. 19), but they have not moved to dismiss the amended complaint; only the City has done so.

The amended complaint was filed on July 20, 2011 (Docket No. 15). It contains multiple theories of liability. First, the amended complaint asserts that the individual police officers conspired with and aided and abetted private citizens in violating Zenquis's rights under the Fourth Amendment (as incorporated under the Fourteenth Amendment) to be free of unreasonable seizures, including unlawful stops, detentions, arrests, and the unlawful use of force. Second, the amended complaint asserts that the conduct of the individual officers violated Zenquis's right to due process under the

Fourteenth Amendment, because the state actors created the danger of harm that befell Zenquis. Both theories—state actors' conspiracy with private actors to violate the Fourth Amendment, and state-created danger in violation of the Fourteenth Amendment—are asserted as the first cause of action against the officers, pleaded under 42 U.S.C. § 1983. They are distinct theories of liability and will be discussed separately.

The amended complaint also asserts, as a second cause of action, that the City is liable for the violation of Zenquis's constitutional rights committed by the individual officers. This claim is built on alternate theories of municipal liability: either the City failed to train the officers (*e.g.*, about the danger of encouraging civilians to use force to apprehend a suspect), and/or the City adopted, condoned, or was deliberately indifferent to a policy, practice, or custom of encouraging private citizens to act as vigilantes. Both alleged failings are said to have caused Zenquis's constitutional injuries.

Finally, the amended complaint asserts that the individual officers are liable to the plaintiff under state-law tort theories of "assault, battery, violation of the common law duty to protect, reckless disregard of safety and civil conspiracy." Am. Compl. ¶ 68.

## II. Jurisdiction and Venue

This court has jurisdiction over the controversy because the amended complaint raises federal questions; the remaining state-law claims may be heard in supplemental jurisdiction. 28 U.S.C. §§ 1331, 1367. The civil-rights counts, under 42 U.S.C. § 1983, would provide an alternate and overlapping source of federal jurisdiction. *Id.* § 1343.

Venue is proper in this court because a substantial portion of the events alleged to give rise to the claims occurred in Philadelphia, within this judicial district.  *Id.* § 1391(b)(2).

### III. Discussion

To withstand the motion to dismiss, the amended complaint "must contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).  The plaintiff's showing of entitlement to relief is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (internal quotation marks omitted); *cf. In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010) (plaintiff must plead enough facts "to raise a reasonable expectation that discovery will reveal evidence of illegality" (internal quotation marks and alteration omitted)).

At this stage, the factual allegations of the amended complaint must be taken as true, but not all material in a complaint qualifies as a factual allegation.  For example, a district court may disregard the complaint's legal conclusions.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009); *see, e.g.*, *McTernan v. City of York*, 577 F.3d 521, 531 (3d Cir. 2009) (disregarding complaint's allegation that space was a "public forum" for First Amendment purposes).  With that caveat in mind, the evaluation of a complaint is ultimately context-specific, aimed at ensuring that the "complaint's

9

statement of facts is adequate . . . to put the defendant on notice of the nature of the plaintiff's claim." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 320 n.18.

Because the plausibility of the amended complaint varies with the elements of Zenquis's several legal theories, I will discuss those theories separately.

**A.     Conspiracy to Violate the Fourth Amendment**

The City argues that Zenquis has failed to allege the necessary facts to state a plausible claim that the police entered into a conspiracy with private citizens to violate Zenquis's constitutional rights.  City's Mot. to Dismiss, at 8-11.

The City does not address this argument to any particular theory of constitutional harm contained in the amended complaint.  As summarized above and confirmed by Zenquis in his opposition to the motion to dismiss, Zenquis relies on conspiracy only to establish the putative liability of the officer defendants, under the Fourth Amendment, for the "seizure" that was committed by private actors.  Pl.'s Mem. of Law in Opp., at 14 & n.6.  Accordingly, I will defer discussion of Zenquis's state-created danger claim for the moment.

The City also does not address the underlying elements of a Fourth Amendment claim—*i.e.*, whether the seizure of Zenquis was reasonable under the circumstances and/or whether the seizure was effected with reasonable force.  *See, e.g.*, *Schneyder v. Smith*, 653 F.3d 313, 322-23 (3d Cir. 2011) (reasonableness of seizure); *Lamont v. New Jersey*, 637 F.3d 177, 182-83 (3d Cir. 2011) (reasonableness of use of force).  I will

assume *arguendo* that the amended complaint adequately alleges facts that would show that both the seizure of Zenquis and the force used to accomplish that seizure were unreasonable.  The only issue disputed by the City is whether the amended complaint alleges enough facts to render plausible the claim of a conspiracy between the officer defendants and the private citizens who seized Zenquis.

"To state a claim under § 1983, a plaintiff . . . must show that the alleged [constitutional] deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  "The color of state law analysis . . . is grounded in a basic and clear requirement, that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (footnote and internal quotation marks omitted).  Ordinarily, this requirement will exclude conduct by private parties.  But when a private party and a public official conspire together to violate the constitutional rights of the plaintiff, the private party's conduct is committed under color of state law:

> [A] private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983.  "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)).

11

Not infrequently this doctrine is invoked in § 1983 suits only seeking recovery from a private party.  *E.g.*, *Adickes*, 398 U.S. at 147-48 (suit against private company based on alleged conspiracy between company employees and local police officers); *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175-76 (3d Cir. 2010) (suit against private firm based on alleged conspiracy between firm and state judges).  It is equally applicable when, as here, the plaintiff seeks recovery from public employees premised on a conspiracy with private parties.  *E.g.*, *Labov v. Lalley*, 809 F.2d 220, 222 (3d Cir. 1987) (suit against local officials alleged to have conspired with private insurance advisor to violate plaintiffs' due process rights); *Dwares v. City of New York*, 985 F.2d 94, 97-98 (2d Cir. 1993) (suit against police officers alleged to have conspired with private individuals to assault plaintiff).[5]

"A civil conspiracy is a combination of two or more persons to do an unlawful or

---

[5]Even if Zenquis proves that there was a conspiracy, whether the individual police defendants would be liable for any or all of the conduct of their alleged co-conspirators is a separate question—one not broached in the City's motion to dismiss or, consequently, in this memorandum.  *See Melo v. Hafer*, 912 F.2d 628, 638 (3d Cir. 1990) (observing in dicta that "conspirators can be held liable for subsequent acts taken pursuant to a conspiracy" to violate civil rights).  *Compare Krilich v. Village of S. Holland*, Civ. No. 92-5285, 1994 WL 457227, at *3 (N.D. Ill. Aug. 19, 1994) (refusing to dismiss complaint against police officer who was alleged to have conspired with second officer to falsely arrest plaintiff, since co-conspirators "can be held responsible for all acts which flow from the conspiracy"), *with Williams v. Fedor*, 69 F. Supp. 2d 649, 666 (M.D. Pa. 1999) (reasoning that even if defendant police chief shared conspiratorial objective with others to violate plaintiff's constitutional rights, police chief could be held liable only "for the *foreseeable* acts of co-conspirators performed to further that conspiracy" (original emphasis) (internal quotation marks omitted)).

12

criminal act or to do a lawful act by unlawful means or for an unlawful purpose."

*Ammlung v. City of Chester*, 494 F.2d 811, 814 (3d Cir. 1974).  To adequately plead a

conspiracy to violate the plaintiff's constitutional rights, the "plaintiff must assert facts

from which a conspiratorial agreement can be inferred."  *Great Western Mining &*

*Mineral Co.*, 615 F.3d at 178.  The inference of agreement is paramount: "[t]o constitute

a conspiracy, there must be a meeting of the minds."  *Startzell v. City of Phila.*, 533 F.3d

183, 205 (3d Cir. 2008) (internal quotation marks omitted); *see also Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007) (requiring that antitrust complaint contain "plausible

grounds to infer an agreement").

    To support the inference of an agreement among the officer defendants and the

private individuals who assaulted him, Zenquis relies principally on the allegation that the

private individuals "had spoken to at least one or more of the individual [police]

defendants, and were told . . . that they should detain [Zenquis] and that they would be

permitted to use force against [Zenquis]."  Am. Compl. ¶ 32.[6]  This is consistent with and

buttressed by the allegations, earlier in the amended complaint, that at least some of the

officer defendants were canvassing the Kensington neighborhood for several hours prior

---

    [6]To be sure, the amended complaint also alleges that the individuals who assaulted
Zenquis "were acting in concert and conspiracy with Philadelphia police officers."  Am.
Compl. ¶ 58.  Although the existence *vel non* of a conspiracy is often treated as a factual
matter for the jury to decide, *see Adickes*, 398 U.S. at 176 (Black, J., concurring), a court
is not required, at the pleading stage, to assume that a plaintiff's bare allegation of
"conspiracy" is true, *see Twombly*, 550 U.S. at 557.

to the assault, advising private citizens (including both the perpetrators of the alleged assault and others) to use force to detain Zenquis.  Am. Compl. ¶¶ 18, 21-22.  Finally, the amended complaint alleges that "civilians who spoke with the individual defendants . . . received the clear message from the officers that they would be free to assault the plaintiff with impunity."  Am. Compl. ¶ 24.

Taken together, these allegations are adequate to state a claim for conspiracy. According to the complaint, the private individuals who assaulted Zenquis were urged by the police to do so, were told they could use force to do so, and understood this to mean that they could assault Zenquis "with impunity."  That is a sufficient basis, at the pleading stage, to ground an inference that there was an agreement between at least some of the officer defendants and the private actors to violate Zenquis's Fourth Amendment right against unreasonable seizure.  In context, it is not implausible that the police would commit themselves to such an agreement during the frenetic search for a suspect wanted for a sensational crime; the plausibility of the conspiracy allegation is further bolstered by the allegation that the police licensed similar behavior in capturing the actual rapist the following day.  At the very least, Zenquis has put the defendants on notice of the nature of the conspiracy claim with sufficiently detailed factual allegations to justify discovery.

B.     **State-Created Danger**

On a theory of state-created danger, the amended complaint also alleges that the individual defendants violated Zenquis's Fourteenth Amendment due process rights.  In

its motion to dismiss, the City appears to have construed the due process claim as alleging that the police violated Zenquis's constitutional rights either by failing to properly investigate the June 1 rape or by failing to protect Zenquis from harm caused by a third party—claims that would be difficult to maintain under settled precedent.  *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-97 (1989).

I do not read the amended complaint as relying on either legal theory identified by the City.  Instead, Zenquis alleges that the actions of the officer defendants "resulted in a *state-created danger* and violated plaintiff's right to due process of law under the Fourteenth Amendment."  Am. Compl. ¶ 66 (emphasis added).

A state-created danger theory is not foreclosed by *Deshaney*.  In that case, the Supreme Court held that the failure of state officials to protect a four-year-old child from traumatic injury at the hands of his father was not actionable under 42 U.S.C. § 1983, because "a State's failure to protect an individual against private violence . . . does not constitute a violation of the Due Process Clause."  489 U.S. at 197.  But the Court intimated that the result might be different had the state officials contributed to the danger facing the plaintiff.  *See id.* at 201 (observing that state "played no part in" creating the dangers facing plaintiff, "nor did it do anything to render him more vulnerable to them").

The Third Circuit has subsequently recognized "the 'state-created danger' theory as a viable mechanism for establishing a constitutional violation under 42 U.S.C. § 1983." *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996).  To establish such a claim, the

15

plaintiff must show:

(1)    the harm ultimately caused was foreseeable and fairly direct;

(2)    a state actor acted with a degree of culpability that shocks the conscience;

(3)    a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subject to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4)    a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and footnotes omitted).

I am not aware of any binding authority from the Third Circuit in which the state-created danger theory has been applied to facts such as are alleged here—*i.e.*, where the police are accused of inciting violence by private parties—though such an application of the theory has been contemplated in non-precedential decisions. *See Cherry v. City of Phila.*, 216 F. App'x 205, 207 (3d Cir. 2007) (insufficient evidence to support plaintiff's state-created danger theory that police falsely identified her as a cooperator in order to place her in harm's way, as a technique to force her to cooperate); *see also Liedy v. Borough of Glenolden*, 117 F. App'x 176, 180 (3d Cir. 2004) (suggesting that police instigation of violence would be actionable). However, the plaintiff has identified a persuasive line of authority from the Second Circuit that appears directly on point. *See*

16

*Okin v. Village of Cornwall-on-Hudson*, 577 F.3d 415, 429 (2d Cir. 2009) ("[T]he Due

Process Clause may be violated when police officers' *affirmative* conduct—as opposed to

*passive* failures to act—creates or increases the risk of private violence, and thereby

enhances the danger to the victim.").

Because the City has, apparently, not read the amended complaint as propounding

this theory, the City's motion to dismiss offers no argument that the amended complaint

fails to allege sufficient facts to render the claim of state-created danger plausible.  In the

absence of such an argument from the moving defendant, I will not dismiss the amended

complaint for failure to state a claim of state-created danger.

## C.      Municipal Liability

The foregoing discussion has addressed only whether the amended complaint

plausibly alleges a constitutional violation by the officer defendants.  The motion to

dismiss now pending before the court was filed only by the City.  To hold the City liable,

the plaintiff faces the additional hurdle of establishing some basis for municipal liability

under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

There is some dispute as to whether this issue is properly before the court.

Zenquis asks that I disregard the *Monell* arguments because the City raised them for the

first time in its reply memorandum and not in the City's initial motion to dismiss.  As a

general rule, "[a] reply brief is intended only to provide an opportunity to respond to the

arguments raised in the response brief; it is not intended as a forum to raise new issues."

17

*United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006).  But in this particular instance, the City's procedural misstep will be forgiven.  Zenquis has addressed *Monell* both in his opposition to the City's motion to dismiss and in his response to the City's reply memorandum.  The issue has been fully joined by both parties.

A municipality such as the City may be held liable for the constitutional injuries inflicted by its employees or agents only when the injuries were caused by official municipal policy, practice, or custom.  *Monell*, 436 U.S. at 690-94.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).[7]  A municipality's failure to train police officers may constitute the relevant policy or custom, but only if "the failure to train amounts to deliberate indifference to the rights of person with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  It is incumbent on the plaintiff to identify the challenged "custom" or "policy" in the complaint.  *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).

---

[7]"A government policy or custom can be established in two ways. Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.  A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well settled as to virtually constitute law. "  *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (internal citation, quotation marks, and alterations omitted).  "In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom."  *Id.*

The City argues that the amended complaint contains only "a formulaic recitation of the elements of a failure to train argument" and otherwise "does not allege a pattern or practice of The City of Philadelphia to violate the rights of its citizens by acts of 'vigilante justice.'"  City's Reply Mem., at 1, 4.  As with the state-created danger theory, the City appears to rely on an overly restrictive reading of the amended complaint. Zenquis has alleged more than mere failure to train.  The amended complaint raises two potential bases for municipal liability.  First, Zenquis claims that the City "has encouraged, tolerated, ratified and has been deliberately indifferent" to a long list of policies and customs alleged to have caused his injury, including "encouragement of civilians to detain and use force against persons identified by police as responsible for criminal acts."  Am. Compl. ¶¶ 67, 67(a).[8]  Second, Zenquis claims that the City has been deliberately indifferent "to the need for more or different training, supervision, investigation or discipline" with respect to the same long list of policies and customs. Am. Compl. ¶ 67.  Failure-to-train is thus supplemental to the central claim that the City itself condoned or ratified the custom that is alleged to have caused Zenquis's injury.

   The factual allegations supporting *Monell* liability are not so lacking as to render Zenquis's claim for relief against the municipality implausible.  To begin, the amended complaint contains two relevant statements from figures who would certainly appear to be

---

[8]In the factual averments earlier in the pleading, Zenquis also alleges that the City had a "policy and practice of tolerating and/or ratifying the encouragement of civilians acting as vigilantes as in the assaults of plaintiff and Carrasquillo."  Am. Compl. ¶ 48.

City policymakers.  Mayor Michael A. Nutter is alleged to have said, after the public

capture of Carrasquillo, that the conduct of the private individuals who detained the rapist

was "a further demonstration that Philadelphians care passionately about the city, about

our quality of life, and certainly about our children."  Am. Compl. ¶ 49.  Police

Commissioner Charles Ramsey is alleged to have said, also after the fact, that "members

of the community were very upset over this, and some may have used more force than a

trained police officer."  Am. Compl. ¶ 50.  In context, both statements may be seen as

providing some factual support for the amended complaint's theory that City

policymakers were deliberately indifferent to a practice of condoning private violence in

the pursuit of suspects.

      Of course, both alleged comments related to the public capture of Carrasquillo, not

Zenquis; both alleged comments also post-dated the assault on Zenquis, and thus neither

could have caused the policy that allegedly harmed him.  But the amended complaint's

theory that the City acquiesced in a practice of condoning private violence in the pursuit

of suspects is also bolstered by several other allegations.  The amended complaint alleges

that the individuals who captured Carrasquillo were given a monetary award and were not

criminally prosecuted, even though the assault on Carrasquillo was recorded on video.

Am. Compl. ¶¶ 45, 51-52.  The amended complaint also alleges that the police conducted

no investigation of the individuals who assaulted Zenquis until after determining that

Zenquis was innocent of the June 1 rape (and after being prompted to investigate by

Zenquis on June 2).  Am. Compl. ¶¶ 34, 39.

Finally, it is relevant to the allegation of a practice or custom, condoned by the City, that the same sort of vigilante violence allegedly directed at Zenquis was also allegedly directed at Carrasquillo.  As pleaded, this is not a situation in which there was a single exceptional incident of constitutional misconduct.  *Cf. Connick*, 131 S. Ct. at 1360-64.[9]  After the mistaken public dissemination of Zenquis's name and photograph as a suspect in the rape, the police are alleged to have adopted the same tactic to apprehend Carrasquillo—*i.e.*, instructing private citizens to detain the suspect and to use force to do so, with the understanding that force could be used "with impunity."  At the least, the two

---

[9]This is not to imply that a single incident of vigilante violence instigated by the police would necessarily be insufficient to state a claim of municipal liability, particularly as to a failure to train.  Although a pattern of prior constitutional violations by untrained employees is ordinarily necessary to show that a municipality was deliberately indifferent to the need for training, such a pattern is not always necessary.  *See Connick*, 131 S. Ct. at 1361 (discussing *City of Canton*, 489 U.S. at 390 & n.10, and *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).  Indeed, Zenquis argues that the City's putative failure to train police officers about the danger of encouraging untrained private citizens to use force to apprehend a suspect was so obviously likely to lead to a constitutional violation that a single incident of harm would suffice to establish a basis for municipal liability.  Pl.'s Resp. Mem., at 5-8.

It is unnecessary to determine at this time whether "single-incident liability" for a failure to train may or should apply in this case.  The amended complaint alleges sufficient facts to justify further discovery as to the police conduct in this and other cases and the awareness and/or tolerance of that conduct by City policymakers.  Many of the "single-incident" cases relied upon by the City to justify dismissal of the complaint were decided upon a far more developed factual record.  *E.g.*, *Connick*, 131 S. Ct. at 1357-58 (after jury trial); *Board of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 402 (same); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 321-24 (2d Cir. 1986) (same); *Patzner v. Burkett*, 779 F.2d 1363, 1366 (8th Cir. 1985) (summary judgment).

21

alleged incidents of vigilante behavior instigated by the police (together with the other allegations catalogued above) are sufficient to place the City on notice of the factual basis for the claim of municipal liability.

### IV. Conclusion

The amended complaint states a claim for relief against the City.  For the foregoing reasons, the City's motion to dismiss the amended complaint will be denied.